Filed 5/12/26  P. v. Swear CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHNNY JAY SWEAR,<br><br>Defendant and Appellant. | F088839<br><br>(Super. Ct. No. 21CR-01804)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Stephanie L. Jamieson, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Plaintiff and Respondent.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Caely E. Fallini, Deputy Attorneys General, for Defendant and Appellant.

-ooOoo-

**INTRODUCTION**

Between August 2012 and December 2017, defendant Johnny Jay Swear sexually abused three girls less than 14 years old and did so multiple times. A jury convicted defendant of four counts of a lewd and lascivious act upon a child less than 14 years old. The trial court sentenced defendant to a total term of 100 years to life in prison, including four separate terms of 25 years to life, pursuant to the "One Strike" law (Pen. Code, § 667.61).[1]

Defendant contends on appeal that the trial court (1) violated his right to due process by excluding a witness's prior statements to police that he read social media communications of two victims in which they discussed the charges, (2) erred in instructing the jury that uncharged offenses testified to by a complaining victim need only be proven by a preponderance of evidence, and (3) erred in computing his presentence actual custody credits. The People concede the latter issue. We accept the People's concession but otherwise affirm the judgement.

**PROCEDURAL HISTORY**

The District Attorney of Merced County filed a third amended information on June 25, 2024, charging defendant with four counts of committing a lewd and lascivious act upon a child under the age of 14 years (§ 288, subd. (a); counts 1–4)[2] and alleging the aggravating circumstance that defendant's convictions in the present case involved more than one victim pursuant to the One Strike law (§ 667.61, subds. (e), (j)(2)) as to all counts. Defendant pleaded not guilty. After an 11-day trial, the jury convicted defendant of all charges and found true the multiple victim aggravating circumstance.

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     The offenses involved three minor victims:  J.R. (counts 1, 2); A.S. (count 3); and M.V. (count 4).

2.

The trial court denied probation and sentenced defendant to four consecutive terms of 25 years to life (§§ 288, subd. (a), 667.61, subd. (j)(2)), for a total term of 100 years to life in prison. The court ordered defendant to pay victim restitution (§ 1202.4, subd. (f)), $10,000 restitution and stayed parole revocation restitution fines (§§ 1202.4, subd. (b), 1202.45, subd. (a)), $160 in court operations assessments (§ 1465.8), $120 in criminal conviction assessments (Gov. Code, § 70373), and $1,300 in sex offender fines (§ 290.3).

This timely appeal followed on October 23, 2024.

## FACTS

### A.  Crimes against J.R. (counts 1, 2)

J.R. was 18 years old when she testified to sexual offenses committed on her by defendant.[3] She lived in Los Banos with her father, mother, K.S., and sister, A.R., who was four and a half years younger.[4] K.S. has five brothers:  defendant; Leon, Jr. (who has a daughter, A.S.); Ron; Anthony; and William.[5] J.R.'s grandfather, Leon, Sr., lived in Modesto with Anthony, defendant, and William (the latter two men shared a room). J.R. frequently visited Leon, Sr.'s home and occasionally spent the night there with her sister and cousins. J.R.'s grandfather and uncles often visited J.R. at her home in Los Banos, and defendant also came multiple times every month and sometimes spent the summer there.

J.R. described the first incident of abuse that she remembered as occurring in defendant's room at her grandfather's house when she was four years old.[6] While

---

[3]     The prosecutor introduced evidence of a timeline of J.R.'s age when she began a school grade and when the school year ended; J.R.'s age increased by one year between commencing and ending a particular grade.

[4]     J.R.'s grandmother also lived with the family until J.R. was 10 years old and in seventh grade.

[5]     In order to avoid confusion, members of defendant's family are referred to by their first names. No disrespect is intended.

[6]     The prosecutor advised the jury in closing argument that this incident was an uncharged sexual offense as described in CALCRIM No. 1191A and could not be considered as the basis

playing in defendant's room, he sat next to her on the bed and asked whether she knew about sex. When she said she did not, defendant played a video of pornography between a man and a woman. He scooted closer to J.R. and told her that the video showed how people love one another but she could not tell her mother. J.R. did not remember anything more regarding that incident.

At J.R.'s house, the common bathroom was located in the hallway. J.R. recalled approximately 10 or more times when defendant would have her lay down on the bathroom floor while he removed her pants and rubbed his penis against her vagina for five to 10 minutes. She estimated these offenses began when she was five or six years old and ended when she was 10 or 11 years old.[7] The last time it happened, the family was at J.R.'s home celebrating a birthday party, and defendant followed her into the house and grabbed her. J.R. resisted, but defendant picked her up then dropped her, causing her to hit the counter as she fell. He picked her up again and carried her into the bathroom. J.R. did not remember what happened next.

J.R. tried to stop the abuse when she was in third grade, but defendant threatened to sexually abuse her sister if she did not agree. J.R. stopped resisting because she could not let him hurt her sister.

Defendant also sexually assaulted J.R. in their laundry room a few times when she was seven or eight years old.[8] Defendant made her lay down on the floor and undress, and then he would rub his penis all over her. She recalled one time when he asked her if he could "put it—" and, even though she said, "[N]o," defendant put his penis into her

---

for the offense charged in count 2 because defendant was not 18 years old at the time. The parties stipulated to defendant's date of birth; he was 18 years old in August 2012.

[7] The prosecutor advised the jury in closing argument that count 2 charged any one of the hallway bathroom incidents that occurred after August 2012 (when defendant turned 18 years old) because J.R. was five years old in 2011 and 10 to 11 years old in 2016 and 2017.

[8] One of these incidents is charged in count 1, when J.R. was nine or 10 years old in 2015 or 2016.

vagina after trying first to put it in her rear end.[9]  This was the only act of penetration that J.R. remembered.  She "vaguely remember[ed]" another time but could not recall any details.

J.R. never told anyone about the abuse until seventh grade, after it had stopped. Her friend, Scout, told J.R. that Scout had been sexually touched by a family member, and J.R. admitted to Scout that defendant (J.R.'s uncle) had also sexually abused J.R. J.R. also discussed it with a neighbor she went to school with when she was in eighth grade because he asked after learning of it from Scout.

Scout and her neighbor were in a romantic relationship.  A few days after J.R.'s conversation with her neighbor, during Christmas break in December 2018 (when she was 13 years old), he approached her again and eventually convinced her to engage in a sexual interaction with him.  He tried to put his penis into her anus but was not entirely successful.  He told people at school, and Scout found out.  Scout sent an angry e-mail to J.R., accusing her of being a slut and expressing disbelief as to J.R.'s claim that defendant raped her.

Afterwards, J.R.'s mother, K.S., noticed something was wrong and uncovered the e-mail from Scout and writings J.R. made in her notebook.  J.R. initially told K.S. that she lied to Scout about the rape but eventually admitted that defendant raped her.  J.R. was not ready to disclose the abuse and knew that it would change family dynamics.  J.R. told K.S. that she thought something had happened to her cousin, A.S., as well.

K.S. took J.R. to the Modesto police station that same day to report the abuse, and the next day she spoke with a deputy sheriff of Merced County.  At that time, J.R. did not reveal that defendant had penetrated her during the abuse and told the deputy that she did not remember.  J.R. was interviewed a week later by a social worker.  The week after that,

---

[9]     Count 1 involved the act in the laundry room.  J.R. acknowledged that she testified at the preliminary hearing and described that defendant had unsuccessfully penetrated her vagina before penetrating her buttocks.

Detective Luis Ortiz interviewed her. During these earlier interviews, J.R. did not want to discuss the acts of penetration, but she remembered some details as time went on.

J.R. commenced talk therapy in May or August 2020[10] when she was a freshman in high school. After four months, J.R. began seeing a different therapist who practiced eye movement desensitization and reprocessing (EMDR)[11] therapy, a 30-minute therapy which used two spheres next to a wire that buzzed simultaneously as she spoke with the therapist. J.R. stopped seeing the therapist in November 2022, when she was a senior in high school. J.R.'s therapy helped her to discuss what defendant had done to her. The EMDR therapy assisted J.R. to remember the acts of molestation because the more she talked about it, the more she remembered.

J.R. testified that she spoke with law enforcement in January 2019 and again in June 2020, but she did not believe her therapy involved EMDR at those times. She also believed that she discussed acts of penetration before her therapy but could not recall if she discussed it with Detective Martha Martinez in June 2020. Before speaking with law enforcement in June 2020, J.R. was upset that defendant had not been arrested or prosecuted.

K.S. testified that J.R. admitted to her on December 31, 2018, that defendant had raped her multiple times. She contacted her brother, Leon, Jr. (A.S.'s father), within a week of reporting J.R.'s abuse to inform him of what defendant had done to J.R. K.S. was concerned because A.S. and her brother would often stay at defendant's residence.

---

[10] J.R. may be mistaken as to the year she started therapy because K.S. testified that J.R. commenced therapy three to four months after K.S. discovered the abuse in late December 2018. K.S. also testified that J.R. started seeing the therapist who used EMDR therapy in December 2019, after J.R. was hospitalized in November 2019.

[11] Defense expert, Dr. Kirsten Domagalski, testified that EMDR refers to eye movement desensitization and reprocessing therapy, which uses bilateral stimulation to induce eye movement that stimulates both sides of the brain and body as an effective treatment for posttraumatic stress disorder.

K.S. also alerted law enforcement that a family with young girls had previously lived with Leon, Sr., and defendant.

K.S. was frustrated as to the progress of the investigation and learned that defendant had been arrested in November 2019 but was to be released for lack of evidence. After J.R. was hospitalized in November 2019, K.S. found a therapist for J.R. who specialized in trauma therapy.

## B. Crime against A.S. (count 3)

A.S., the daughter of Leon, Jr., was 13 years old when she testified that she lived with her family in Nevada but visited and stayed overnight at her grandfather's, Leon, Sr.'s, residence where defendant also lived. During one visit when A.S. was asleep on the living room couch, defendant picked her up and placed his hand into her pants. She previously testified that this first incident occurred when she was four years old. She also testified that defendant put his hand down her pants and touched her vagina while she was in his room playing a videogame when she was six or seven years old. He grabbed her hand to "touch[] something, but [she did not] know what it was." She described it as "very round and very smooth," and she thought it was a ball. She previously testified that this second incident occurred when she was five or six years old.[12]

A.S. discussed the abuse with her mother when she was in third grade because her mother asked A.S. about the abuse after speaking with K.S. A.S. vaguely recalled discussing the abuse with her cousin, J.R., before her mother asked about it and when A.S. was five years old.

## C. Crime against M.V. (count 4)

Jenny L., M.V.'s mother, testified that her family became close with Leon, Jr., and his family would regularly visit Leon, Sr.'s home, where defendant lived, between 2005

---

[12] In closing argument, the prosecutor argued that either the first or second incident could form the basis for the offense charged in count 3 involving A.S.

and 2016. The two families would take trips together, including M.V. and defendant. Jenny's family moved to Texas in 2015 but stayed at defendant's residence for a month and a half after they returned to Modesto in 2016. In 2019, the day before Christmas, Jenny was arguing with her husband concerning Jenny's relationship with her mother. Jenny's husband mentioned that her mother had not protected Jenny after a family member assaulted her when she young. M.V. overheard and angrily told them that they had not been there for her when she was assaulted. When Jenny discovered that M.V. had been injured, she insisted they go to the Modesto Police Department and report it. At some point thereafter, Detective Martinez contacted them. Detective Martinez testified that she learned of M.V. and her family from K.S., J.R.'s mother.

M.V. was 19 years old when she testified that her parents were friends with Leon, Sr., visited his home, and went on outings together. M.V. was five or six years old the first time defendant touched her inappropriately.[13] Her family was camping with defendant who agreed to take M.V. to the lake. While in the water, defendant instructed M.V. to hold onto the edge of a boat, and he touched her vagina under her swimsuit. She ran from him out of the lake but did not tell anyone what happened because she feared that it would ruin the trip. M.V. acknowledged that she previously told law enforcement that this incident occurred on the boat and not in the water next to it and that defendant had sexual intercourse with her during the incident. She testified that she previously said that defendant had put his penis into her vagina during this incident but later remembered that he only touched her. She explained that over time, she had remembered the incident more clearly.

---

[13] M.V. was born in 2005, so this incident most likely occurred in 2010 or 2011. The prosecutor advised the jury in closing argument that this incident was an uncharged sexual offense as described in CALCRIM No. 1191A and could not be considered as the basis for the offense charged in count 4 because defendant was not 18 years old at the time.

M.V. also described an incident that occurred in 2014 after she and her father remained at Leon, Sr.'s house while her mother took her sister to soccer practice. While playing with Legos in the hallway, defendant called her into his room, took down her pants and underwear, and inserted his penis into her vagina for approximately three minutes.[14] She told defendant to get off her, but defendant just told her to be quiet. M.V. then dressed and ran into the kitchen where her father was sitting.

When M.V. was seven years old, Leon, Sr., and defendant came to help them move. While in her grandmother's room at the back of the house, defendant shut the door, closed the sliding door curtains, and took off her pants. Although M.V. attempted to fight him, defendant put his penis into her vagina.[15] The incident ended when they heard noises outside the room.

M.V. described her last clear memory of abuse that occurred while she, her mother, and her sister were sleeping in defendant's living room. Defendant woke M.V. as she slept on the couch, told her to be quiet, picked her up, and carried her to Leon, Sr.'s unoccupied bedroom. She was able to push him off and ran back to the couch, but he followed, took her back to the bedroom, and removed her pants. M.V. again ran from the room and into the kitchen pantry to hide. She dropped some food items, and defendant was angry that she made noise and a mess that would get them into trouble. M.V. then hid under the table, crying, and defendant stopped. The abuse stopped in 2014 or 2015 when M.V. was nine years old.

M.V. described that she revealed the abuse to her parents just before Christmas when she was 14 or 15 years old. M.V. wanted to visit her grandmother on Christmas, but her father did not want her to go and was fighting with M.V.'s mother. M.V. reached

---

[14]    The prosecutor argued in closing argument that this incident could be used to convict defendant of count 4.

[15]    The prosecutor argued in closing argument that this incident occurred in 2012 or 2013, when M.V. was seven years old, and was the incident charged in count 4.

a "breaking point" and told them that defendant had raped her. Her parents took M.V. to the Modesto Police Department to make a statement that same day. M.V. was uncomfortable during the police interview and perceived the officer as hostile.

### D.      Defense

The defense recalled witnesses to testify as to prior inconsistent statements of J.R. and M.V. Modesto Police Officer Joaquin Flores testified that he interviewed M.V. on the morning of December 24, 2019, after she and her mother came to the police department and reported defendant had sexually assaulted M.V. M.V. understood that sexual intercourse described the act of a penis entering a vagina and said that defendant had sexually assaulted her in a bedroom when she was six years old, defendant had sexual intercourse with her on a boat, and she had flashbacks of other incidents, although she could not remember dates and times.

Detective Martinez testified that she interviewed M.V. on June 1, 2020, and found M.V. to be shy, reserved, and nervous, which is typical of someone being interviewed about something difficult to discuss. M.V. understood the term "sexual intercourse" and said that defendant had sexual intercourse with her approximately 15 times. When M.V. described the lake incident to Detective Martinez, she said that defendant had sexual intercourse with her on a boat and did not correct her statement to say that defendant only touched her and she was next to the boat but not in it. M.V. also described a time when defendant had sexual intercourse with her while she was sleeping over at Leon, Sr.'s house.

When interviewed in January 2019, J.R. told a deputy sheriff of Merced County that defendant had touched her inappropriately and rubbed his private parts on her private part, but she was unaware of whether he had penetrated her.

Detective Martinez reviewed a recording of J.R.'s January 9, 2019 interview with a social worker and agreed that J.R. did not say that defendant had penetrated her during the incidents discussed. During a subsequent interview on June 26, 2020, J.R. said that

she had previously not told the social worker that defendant had penetrated her and wanted to discuss those incidents of which she had vibrant flashbacks after having been in therapy.

The defense also presented testimony by Dr. Kirsten Domagalski, an expert in memory research, regarding EMDR, the type of therapy that J.R. testified was used by her second therapist. Although not a trained therapist and having no clinical training on administering EMDR therapy, Dr. Domagalski testified that EMDR therapy is a common treatment for posttraumatic stress disorder that seeks to stimulate both sides of a patient's brain and body by either causing the eyes to follow a dot back and forth or with tapping motions. Bilateral stimulation aids in decreasing the vividness and emotionality of a patient's troubling memory to lessen the trauma-based symptoms from the memory.

Prior to becoming a doctor, Dr. Domagalski conducted a study and published a paper concerning how EMDR may impact memory and concluded that eye movements did not enhance or negatively impact memory. However, EMDR therapy may undermine the accuracy of memory depending upon the therapist's belief's and therapeutic instructions. EMDR therapists generally believe in the notion of repressed memories at a higher rate, although no empirical evidence shows that repressed memories occur, and may suggest this possibility to the patient who then develops a memory based upon the therapist's suggestions. Dr. Domagalski opined that during EMDR therapy, a therapist may suggest something happened to the patient, and the patient feels pressure to accept the therapist's suggestion. Therefore, anytime a patient recovers a memory in therapy, it is possible that the memory is contaminated, and the risk of such is higher when using EMDR therapy.

Dr. Domagalski acknowledged that she never met J.R. or her therapist nor reviewed J.R.'s treatment file or details of J.R.'s therapy. She also acknowledged the opinion that EMDR therapy can create false memories is not universally held in the scientific community.

## DISCUSSION

**I.** ***The trial court did not abuse its discretion in excluding testimony by Leon, Jr., that would contradict his statements to law enforcement that J.R. and A.S. communicated by Facebook messenger.***

### A. Background

Defense counsel questioned J.R. as to whether she ever used Facebook messenger to communicate with A.S. in Nevada. J.R. explained that she did not have a phone until she entered high school and did not use Facebook messenger on any other device. J.R. also denied ever telling A.S. what defendant had done to J.R., although A.S. had told J.R. what defendant had done to A.S. during a conversation that occurred years before J.R. first discussed the abuse with her mother.

A.S. testified that she did not use a messenger application to keep in touch with J.R. but may have communicated once via FaceTime sometime after she had spoken with police. A.S. also recalled speaking to J.R. once about defendant, possibly when she was five years old, although J.R. did not discuss her own abuse, but A.S. did not communicate with J.R. about defendant before A.S. spoke with the police.

Defense counsel requested permission to introduce evidence that would contradict J.R.'s and A.S.'s testimony concerning their discussions of defendant's abuse before reporting it to law enforcement. He intended to call Leon, Jr., to testify as to the facts he imparted to Detective Martinez and, if he denied them, call Detective Martinez to testify to the statements.

As an offer of proof, defense counsel advised the court that Leon, Jr., provided a telephonic statement to police on August 26, 2019, and advised that he first discovered A.S. was sexually abused by checking a Facebook messenger chat application that he had set up for A.S. to communicate with J.R. By reviewing the messenger application communications, he and his wife became aware that A.S. and J.R. had been sexually assaulted. The communications indicated that J.R. did not wish to visit defendant's

12.

residence because of her experiences with defendant. Defense counsel argued that it was "clear that they were discussing at the very least [J.R.'s] experience [and] that [A.S.] was aware of [J.R.'s] experience before A.S. was interviewed." Defense counsel acknowledged that trial testimony indicated that other circumstances[16] first prompted involving the police despite Leon, Jr.'s statements that he first became aware of the abuse through the communications. Defense counsel expected that Leon, Jr., would testify that he did not set up Facebook messenger for A.S. and did not make the statements attributed to him by Detective Martinez. Defense counsel expected that Detective Martinez, however, would testify consistently with her report, which noted that Leon, Jr., told her that J.R. and A.S. "had been talking on the application and when he and his wife checked their conversations, they became aware that both girls had been sexually assaulted."

The prosecutor argued that Leon, Jr.'s statements to Detective Martinez did not definitively indicate whether or not he was a percipient witness to the communications or whether he learned of them through speaking with his wife.

Leon, Jr., testified that he did not recall having a conversation with Detective Martinez in August 2019, nor did he remember any conversations he may have had with any member of law enforcement. He denied setting up a Facebook messenger application for A.S. As far as Leon, Jr., was aware, J.R. and A.S. only communicated using telephone, and he learned from his wife of a communication between A.S. and J.R. in which A.S. "was saying she wanted to—she's going to be in California visiting her cousin and said she doesn't want to go because of [defendant]." Leon, Jr., did not know if they communicated regarding sexual abuse but knew that J.R. told A.S. she did not want to be around defendant, which caused his wife to talk about it with A.S. However, he did not

---

**16**    K.S. testified that she contacted Leon, Jr., concerning the possible abuse approximately one week after learning of it from J.R. A.S. testified that her mother asked her about the abuse after speaking with K.S.

know when that conversation occurred nor how his wife became aware of the conversation.

The court summarized that defense counsel intended to call Leon, Jr., to impeach him with his own statements allegedly made to Detective Martinez, who would then be called to the stand "to testify about her understanding of a conversation she had with him five years ago all in order to use [Detective] Martinez's understanding of that conversation to impeach [J.R.] and [A.S.] noting that the impeachment is tangential. It's not even direct impeachment." The court noted that while the two girls were asked whether they had discussed abuse, Leon, Jr., recalled that his wife told him that J.R. told A.S. that J.R. did not want to go to defendant's residence because she was not comfortable. Therefore, the court concluded that the proposed evidence was "too tenuous" and did not "equal what the defense wants it to equal and instead it results in the bootstrapping of information and hearsay statements into this trial that have no place and multiple hearsay at that. [Leon, Jr.,] had no personal knowledge of this conversation between [A.S. and J.R.]." The court found that the value of Leon, Jr.'s statements to Detective Martinez was "extremely limited" and excluded the testimony.

**B.      Applicable Law and Standard of Review**

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with [their] testimony at the hearing …." (Evid. Code, § 1235.) But a trial court's decision to admit or exclude a hearsay statement under this hearsay exception will not be disturbed on appeal absent a showing of abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 956.) When the admissibility of evidence turns on the existence of a preliminary fact (see Evid. Code, § 403), the trial court may hold a hearing outside the jury's presence to determine whether that preliminary fact exists. (*Jones*, at p. 956.) " 'The court should exclude the proffered evidence only if the "showing of preliminary facts is too weak to support a favorable determination by the jury." [Citations.] The decision whether the foundational evidence

14.

is sufficiently substantial is a matter within the court's discretion.' " (*Ibid.*) " '[T]he judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. The "question of admissibility … merges imperceptibly into the weight of the evidence, if admitted." ' " (*People v. Lucas* (1995) 12 Cal.4th 415, 467, quoting with approval Legis. Com. com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 403, p. 361.)

Generally, a defendant is entitled to cross-examine a witness regarding their motive or bias. (Evid. Code, § 780, subd. (f).) "However, the right to cross-examine a witness on potential bias, prejudice, or ulterior motive isn't absolute." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1051.) Evidence Code section 352 grants a trial court broad discretion to exclude evidence to " 'prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301.) We review evidentiary rulings for abuse of discretion. (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.) A trial court's ruling to admit or exclude evidence offered for impeachment will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) We may uphold its ruling on any ground if correct in result. (*People v. Brown* (2004) 33 Cal.4th 892, 901 [when deciding challenge to admission or exclusion of evidence, appellate courts examine the result, not the trial court's rationale].)

The federal Constitution also guarantees criminal defendants a meaningful opportunity to present a complete defense (*Nevada v. Jackson* (2013) 569 U.S. 505, 509; *California v. Trombetta* (1984) 467 U.S. 479, 485), and the constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility (*People v. Quartermain* (1997) 16 Cal.4th 600, 623). However, trial judges retain wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the

15.

witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; accord, *People v. Brown* (2003) 31 Cal.4th 518, 545.)

### C. Analysis

Defendant argues that Leon, Jr.'s statements to law enforcement were admissible to contradict J.R.'s and A.S.'s testimony that they did not discuss their allegations against defendant before A.S. made her report to law enforcement.[17] Because the evidence was relevant and admissible to attack the credibility of J.R. and A.S., defendant argues the trial court erred in excluding the evidence and violated defendant's constitutional rights to due process, confrontation, and to present a defense.

We agree with the trial court that defendant never presented sufficient evidence to allow the jury to find that J.R. and A.S. discussed the details of their sexual abuse. J.R. and A.S. testified that J.R. did not describe to A.S. what defendant had done to her. Detective Martinez would testify only that Leon, Jr., and his wife checked the girls' communications and "became aware that both girls had been sexually assaulted." Given that defense counsel failed to present evidence of the girls' actual statements and the communications alleged to have been made, Leon, Jr., could have learned of their sexual abuse through communications that, while suggestive that defendant did something to J.R. and A.S., did not include a discussion of the details of the abuse. Leon, Jr., testified that A.S. "was saying she wanted to—she's going to be in California visiting her cousin and said she doesn't want to go because of [defendant]." He also testified that J.R. told A.S. she did not want to be around defendant, which caused his wife to talk with A.S. and learn that A.S. had been abused. Leon, Jr.'s testimony is consistent with his statement to Detective Martinez that they learned of the abuse through reviewing A.S.'s

---

[17] A.S. first spoke to law enforcement about the abuse in September 2019.

16.

communications with J.R.  It is also consistent with both J.R.'s and A.S.'s testimony that J.R. did not tell A.S. what defendant had done to J.R.

Detective Martinez's proffered testimony did not purport to include any statement relayed by Leon, Jr., that was actually made by either J.R. or A.S.  We recognize that "[r]elevant evidence includes not only evidence of the *ultimate* facts in dispute but also evidence of *intermediate* facts, that is, facts from which the ultimate fact may reasonably be inferred.  [Citations.]  'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' " (*People v. Rodriguez, supra*, 20 Cal.4th at pp. 18–19.)  Leon, Jr.'s awareness of A.S.'s sexual abuse from reviewing her communications is characterized as an intermediate fact from which defendant wanted the jury to infer J.R. and A.S. communicated details of their sexual abuse and, therefore, that they coordinated their statements to falsify or strengthen the evidence against defendant, a fact which would affect the jury's view of their credibility.  (See *People v. Hill* (1992) 3 Cal.4th 959, 987, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Nonetheless, we cannot conclude that this evidence, " 'in the light of logic, reason, experience, or common sense, has, by reasonable inference, a tendency to prove or disprove' " that J.R. and A.S. discussed the details of their sexual abuse.  (*People v. Hill, supra*, 3 Cal.4th at p. 988, overruled on other grounds in *Price v. Superior Court, supra*, 25 Cal.4th at p. 1069, fn. 13.)  If the jury believed that Leon, Jr., reviewed something in the communications that alerted him to the possibility of abuse, logic, reason, experience, or common sense would not have resulted in the reasonable inference that the girls exchanged details of the abuse.  "The court must exclude irrelevant proffered evidence which [tends] to prove or disprove a disputed fact only if the trier of fact must draw speculative or conjectural inferences from it." (*People v. Parrison* (1982) 137 Cal.App.3d 529, 539, citing 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982)

17.

§ 21.3, rule (1)(b), p. 502 [proffered evidence is not relevant if it tends to prove or disprove a fact of consequence to determination of the action only by resort to inferences or deductions from that evidence that are speculative or conjectural in nature].)  The evidence of Leon, Jr.'s statements to Detective Martinez would prove J.R. and A.S. lied in court concerning the extent of their communications only by the conjectural and speculative inference as to what the girls actually communicated to each other.

Under the circumstances, the trial court did not abuse its broad discretion by excluding the evidence because defendant failed to present evidence that, if believed by the jury, would have shown J.R. discussed her sexual abuse with A.S. or communicated to A.S. details of abuse that influenced either A.S.'s statement to police or testimony concerning the abuse.

There being no abuse of discretion in excluding the evidence under Evidence Code section 1235, we also reject defendant's additional claim that the trial court's ruling deprived him of his federal constitutional right to present a defense.  The routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights.  (*People v. Jones, supra*, 57 Cal.4th at p. 957.)  "Instead, because the trial court merely excluded some evidence that could have impeached a complaining witness and did not preclude defendant from presenting a defense, any error would be one of state evidentiary law only." (*Ibid.*)

Additionally, given the minimal probative value of the proffered evidence, we find no abuse of discretion in excluding the evidence pursuant to Evidence Code section 352, and, if we found error, we would conclude any error is harmless for the same reasons. Even if the trial court's ruling was an abuse of discretion under state law, however, it is not reasonably probable that the court's minimal restriction on the scope of cross-examination prejudiced defendant.  We may not reverse a judgment on the basis of the erroneous exclusion of evidence unless the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 354; *People v. Watson* (1956) 46 Cal.2d 818,

836.)  " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

We agree with the People that the excluded evidence would not have produced a significantly different impression of J.R.'s and A.S.'s credibility.  As we discussed, the inference that J.R. and A.S. colluded concerning their accusations of abuse is highly speculative and unlikely given both girls testified as to distinctly different acts of abuse: J.R. testified that defendant rubbed his penis on her vagina and penetrated her while A.S. described that defendant touched her vagina with his hand.  In addition, J.R. provided information to K.S. that A.S. may have been sexually abused when she revealed her own abuse on December 31, 2018, which was months before A.S. made her statement to police in September 2019, thereby weakening any inference of collusion based upon other communications.  Moreover, J.R. admitted that she did not recall something several times rather than fabricate instances of abuse, such as when she recalled defendant put his hand on her leg during the video incident or carried her to the hallway bathroom during that incident but then did not recall what happened thereafter.  And, although defendant argued that J.R. failed to discuss acts of penetration during her initial interviews with law enforcement (to suggest she falsified her testimony over time), the evidence showed that before reporting the abuse to police, J.R. had told her friend she was raped by her uncle (defendant) and, upon questioning by her mother, told her mother the same.

Defendant also cross-examined both J.R. and A.S. concerning multiple inconsistent statements regarding their abuse allegations, so the defense had " 'ample opportunity' " to impeach both victims.  (*People v. Contreras* (2013) 58 Cal.4th 123, 153.)  The defense also heavily stressed those inconsistencies in closing argument and implored the jury "to pay special attention to any discrepancies, any inconsistencies when that's all we have is accusations."  The trial court instructed the jurors that if they decided J.R. or A.S. "deliberately lied about something significant in this case," they "should

19.

consider not believing anything that witness says.  Or, if [they] think the witness lied about some things, but told the truth about others, [they] may simply accept the part that [they] think is true and ignore the rest."

Most importantly, M.V.'s testimony was not affected by the excluded evidence, and she provided independent corroboration of defendant's propensity to commit sexual offenses.  The jury was instructed pursuant to CALCRIM No. 1191B that if it found beyond a reasonable doubt that defendant committed one or more of the charged offenses, it could conclude from that evidence that appellant was "disposed or inclined to commit sexual offenses and based on that decision also conclude that [] defendant was likely to commit and did commit the other sex[ual] offenses charged in this case."

Based upon the foregoing, we conclude that defendant has failed to " 'show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran, supra*, 56 Cal.4th at p. 955.)  Although we reject defendant's argument that the trial court abused its discretion in excluding Leon, Jr.'s prior statements to Detective Martinez, we find any error was harmless.

## II.     *The trial court did not err in instructing the jury with a modified version of CALCRIM No. 1191A.*

### A.     Background

The trial court instructed the jury with a modified version of CALCRIM No. 1191A as follows:  "The People presented evidence that [] defendant committed the crimes of lewd acts upon a child against [M.V.] around 2011, the lake incident, lewd act upon a child against [J.R.] around 2010, that is the video in the bedroom incident, and lewd act upon a child against [J.R.] around 2011, the hallway bathroom incidents.· They were not charged in this case.· These crimes are defined for you in these instructions.  [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that [] defendant, in fact, committed the uncharged offenses.· Proof by a preponderance of the evidence is a different burden of proof from proof beyond a

20.

reasonable doubt.· A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶]  If the People have not met this burden you must disregard this eviden[ce] entirely.· If you decide that [] defendant committed the uncharged offenses, you may but are not required to conclude from that evidence that [] defendant was disposed or inclined to commit sexual offenses and based on that decision also conclude that [] defendant was likely to commit lewd acts upon a child as charged here.  [¶]  If you conclude that [] defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  [¶]  It is not sufficient by itself to prove that [] defendant is guilty of lewd acts upon a child as charged.· The People must still prove the charges beyond a reasonable doubt.  Do not consider this evidence for any other purpose."

**B.      Applicable Law and Standard of Review**

In determining whether a trial court erred in giving a jury instruction, "we … view [the] challenged [instruction] 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013 (*Reliford*).)

**C.      Analysis**

Defendant argues that the trial court violated his right to due process when it read CALCRIM No. 1191A, which instructed the jury that it only needed to find that defendant committed the uncharged offense by a preponderance of the evidence, a different standard than beyond a reasonable doubt.  According to defendant, when propensity evidence is supplied by the victim of the charged offenses, it must be proven beyond a reasonable doubt to prevent inevitable juror confusion in applying two different evidentiary standards to the victims' testimonies as to offenses both charged and uncharged.

21.

The court in *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*) rejected defendant's argument. In that case, the victim of the charged sexual offenses recounted uncharged sexual offenses the defendant committed against her. (*Id.* at p. 496.) On appeal, the defendant claimed that giving former CALCRIM No. 1191 improperly allowed the victim to corroborate her own testimony. (*Gonzales*, at p. 500.) Two justices rejected the claim, concluding that since the evidence was admissible for the purposes stated in former CALCRIM No. 1191, former CALCRIM No. 1191 correctly instructed the jury. (*Gonzales*, at p. 501.) They noted that section 1108 is not limited to the testimony of third parties and found nothing irrational about a victim supporting his or her own testimony with testimony of uncharged sexual offenses. Although agreeing such testimony is not as probative as similar testimony from a third party, they found it probative, nonetheless. (*Gonzales*, at p. 502.) They also rejected the claim the instruction likely resulted in the jury misapplying the burden of proof for the charged offenses, noting former CALCRIM No. 1191 told jurors the uncharged offenses were only one factor to consider, they were not sufficient by themselves to prove the defendant was guilty of the charged offenses, and the People must still prove the charged offenses beyond a reasonable doubt. (*Gonzales*, at p. 502.)

In arguing that CALCRIM No. 1191A risked confusing the jury, defendant largely relies upon the concurring opinion of Justice Perren in *Gonzales, supra*, 16 Cal.App.5th 494. Justice Perren reasoned that "[i]nviting the jury to apply a lesser standard of proof as to [the victim's] credibility regarding uncharged offenses, and then consider that evidence as proof of [their] credibility beyond a reasonable doubt as to the charged offenses, confuses the issue and threatens to undermine confidence in the result." (*Id.* at p. 507 (conc. opn. of Perren, J.).)

In *People v. Panighetti* (2023) 95 Cal.App.5th 978, 998 (*Panighetti*), the Third District Court of Appeal reviewed the propriety of CALCRIM No. 1191A. In that case, Panighetti was convicted of several sexual offenses for actions he took that exceeded the

scope of his victim's consent.  (*Panighetti*, at p. 982.)  At trial, the victim testified Panighetti committed multiple prior uncharged criminal sexual offenses and domestic violence upon her.  (*Id.* at p. 996.)  This evidence was admitted to prove Panighetti's propensity to commit the charged offenses.  (*Ibid.*)  Based on our Supreme Court's decision in *Reliford, supra*, 29 Cal.4th at page 1013, the court concluded that CALCRIM No. 1191A was consistent with the law and did not violate Panighetti's due process rights.  (*Panighetti*, at pp. 997, 1000.)

In *Reliford,* our Supreme Court addressed the argument that a jury instruction similar in all material respects to CALCRIM No. 1191A was " 'likely to mislead the jury concerning … the prosecution's burden of proof.' "  (*Reliford, supra*, 29 Cal.4th at p. 1012.)  Our Supreme Court rejected this argument:  "We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof.  Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether [the] defendant committed a prior sexual offense ….  The instructions instead explained that, in all other respects, the People had the burden of proving [the] defendant guilty 'beyond a reasonable doubt.' "  (*Id.* at p. 1016.)  Our Supreme Court also rejected the contention that, even if the instruction is correct, it "is too 'complicated' for jurors to apply."  (*Ibid.*)  The Supreme Court "presume[d] … that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations."  (*Ibid.*)

The *Panighetti* court similarly concluded that the instruction did not confuse or mislead the jury or lower the standard of proof for guilt on the charged offenses.  (*Panighetti, supra*, 95 Cal.App.5th at pp. 997, 1000.)  The court specifically rejected Panighetti's contention that it is too complicated a task for a jury to distinguish between the burden of proof by a preponderance of the evidence for uncharged offenses and proof

23.

beyond a reasonable doubt for charged offenses when the evidence of charged and uncharged offenses comes from the testimony of the same victim. (*Id.* at p. 998.) Having found the instruction correctly stated the law, the court declined to act on Justice Perren's concerns as stated in his concurring opinion in *Gonzales, supra*, 16 Cal.App.5th 494. (*Panighetti*, at p. 998, fn. 8.)

Accordingly, like our Supreme Court in *Reliford* and the court in *Panighetti*, we presume that the jurors grasped their duty to apply the preponderance standard for the limited purpose described in CALCRIM No. 1191A and the reasonable doubt standard for all other determinations. (See *Reliford, supra*, 29 Cal.4th at p. 1016; *Panighetti, supra*, 95 Cal.App.5th at p. 998 ["[T]he focus in *Reliford* was whether use of a different standard of proof for uncharged offenses negatively interfered with the People's ultimate burden of proof for the charged offenses. The existence of that problem is dependent on the instructions themselves, not the source of the evidence."].)

Defendant does not argue that *Reliford* is no longer good law, he argues that *Reliford* did not rule on the precise issue presented in this case, that is, that CALCRIM No. 1191A is too complicated for jurors to apply where the victim of the charged offense provides evidence of the uncharged offenses. We agree with the court in *Panighetti* that "the focus in *Reliford* was whether use of a different standard of proof for uncharged offenses negatively interfered with the People's ultimate burden of proof for the charged offenses. The existence of that problem is dependent on the instructions themselves, not the source of the evidence." (*Panighetti, supra*, 95 Cal.App.5th at p. 998.)

But, even if defendant is correct that *Reliford* is not controlling, we would reach the same result. Based on the record, there is no reasonable likelihood that the jury found defendant guilty under the lower preponderance standard. We assume that jurors are " ' "intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The trial court here repeatedly instructed the jury that the charged offenses had to be proved

24.

beyond a reasonable doubt.  Conversely, the trial court only told the jury to apply the preponderance of the evidence standard once, and when doing so, it informed the jury of the limited situation where it was to apply that standard and that "[t]he People must still prove the charges beyond a reasonable doubt."  Moreover, both defense counsel and the prosecutor told the jury that the charges had to be proved beyond a reasonable doubt. There is nothing in the record suggesting that these instructions or the arguments from the parties confused the jury.

Because CALCRIM No. 1191A accurately states the law and does not violate defendant's due process rights, the trial court did not err in instructing the jury.

### III.    *The trial court erred in calculating defendant's actual custody credits.*

Defendant was arrested on November 20, 2019, and released on November 22, 2019, for a total of three days in actual custody.  Defendant was arrested again on May 19, 2022, and was in custody as of the date of his sentencing on October 23, 2024. The probation report calculated defendant's custody credits at 855 days as of September 16, 2024, and the trial court initially ordered custody credits of 855 days. Before the hearing concluded, however, the court corrected defendant's custody credits to 889 days in light of the October 23, 2024 sentencing date.  However, 889 is the number of days between defendant's second arrest on May 19, 2022, and the sentencing date, but it does not include the three days defendant was in custody in November 2019.

We independently review whether a trial court has correctly awarded custody credits.  (*People v. Arevalo* (2018) 20 Cal.App.5th 821, 827; *People v. Anaya* (2007) 158 Cal.App.4th 608, 611.)  A defendant accrues actual custody credits pursuant to section 2900.5 for time spent in custody prior to sentencing.  (*Arevalo*, at p. 827.)  Actual custody credits are calculated by adding together "all days of custody" the defendant has served.  (§ 2900.5, subd. (a).)

The parties agree that defendant's custody credits should be increased by the three days he was in custody in November 2019, and we agree.  The failure to award earned

25.

custody credits results in an unauthorized sentence, which we may correct. (*People v. Boyd* (2024) 103 Cal.App.5th 56, 65–71.) Because the amount of presentence credits appears from our record, we may modify the award of presentence credits to reflect the correct amount. (*People v. Jones* (2000) 82 Cal.App.4th 485, 493.)

Accordingly, we conclude the judgment should be modified to award defendant an additional three days of actual custody credit for the period from November 20, 2019, through November 22, 2019, for a total of 892 days.

## DISPOSITION

The judgment is modified to award defendant an additional three days of actual custody credit for the period of time from November 20, 2019 through November 22, 2019, for a total of 892 days. Upon issuance of the remittitur, the trial court shall recompute the custody credit award and the clerk shall prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


HILL, P. J.

WE CONCUR:


PEÑA, J.


HARRELL, J.

26.